BILLINGS v. SHORES et al. (two cases).

(Circuit Court of Appeals, Seventh Circuit. January 2, 1907.)

Nos. 1,265, 1,266.

MORTGAGES—PROCEEDINGS TO COMPEL RELEASE—PAYMENT—EVIDENCE TO ESTABLISH.

Evidence considered, and *held* to sustain findings by the trial court that under contracts between complainants and defendant and between defendant and a mining company complainants were entitled to have a mortgage indebtedness owing from them to defendant paid from the proceeds of iron ore sold by defendant as sales agent for the mining company, and to a release of the mortgage and the conveyance of other property held by defendant as security.

Appeals from the Circuit Court of the United States for the Western District of Wisconsin.

The appellant in both of these appeals, Frank Billings, was the defendant below in each of two suits in equity, brought by Eugene A. Shores and Emma W. Shores, as complainants (originally in the state court, but removed to the trial court), and the decree in each case granted the relief sought in the bills, respectively. In No. 1,265 the bill sets up the execution of a mortgage upon her homestead by the appellee Emma W. Shores and her husband, Eugene A. Shores, in favor of the appellant, avers payment of the indebtedness thereby secured, and prays decree of satisfaction and discharge. The appellant answered, denying payment, filed a cross-bill for foreclosure of the mortgage, and issues were duly joined. In No. 1,266 the bill sets up a contract made by the appellant to convey to Emma W. Shores an undivided two-thirds of a mining fee, upon payment of $13,000 and interest, avers such payment, and prays decree for specific performance. Other parties were originally named defendants, as claiming subordinate liens, but were dismissed upon disclaimer of interest. The appellant answered denying payment and sought foreclosure under a cross-bill; issues being duly joined. Under each bill the fact of payment is the only issue; and both involve consideration and state of fact, which are substantially identical.

Under the cross-bill in the last-mentioned suit (1,266) the court awarded to the appellant, Billings, recovery for sums aggregating $1,630.77 (together with interest) for expenditures in defending the title to the property, which were chargeable to the appellees pursuant to the contract; and the decree required payment of such sum, interest, and costs as condition precedent to the relief sought in the original bill. Such payment was subsequently made by the appellees and their decree became effectual. The appeals are by Billings alone, from each of the main decrees.

The appellant in all transactions which enter into the controversies represented the firm of Tod, Stambaugh & Co., brokers and traders in iron ores, although in the above-mentioned mortgage and land contract transactions he was named individually, and so executed each instrument. He was at the outset business manager for that firm and ultimately managing partner; but no dispute arises over such interests and relations.

Another suit was pending at law between Tod, Stambaugh & Co., as plaintiffs, and Shores Mining Company and William H. Upham, defendants, for recovery of alleged indebtedness, which involved, in part, the same transactions at issue under the bills. The testimony in all these actions was taken before a special master (a jury having been waived in the case at law), without distinctions between them; and thereupon the cases were submitted and heard together in the trial court. The only findings of fact and law which appear were in the last-mentioned case, and by stipulation these findings are in the present record for review, in so far as applicable to the equity issues. It also appears (and is conceded) that the conclusions of the trial court were against the plaintiffs upon the state of facts there submitted, and that no review is sought in that case.

151 F.—24

1. The mortgage, which is the subject-matter of the first-mentioned bill (No. 1,265), was executed by the appellees July 23, 1897, to secure notes made by them of even date for $8,666.67, payable on or before one year thereafter, with interest at 6 per cent. It was made in conformity with an agreement between the parties which reads:

"This agreement made at Ashland, in the state of Wisconsin, this 23rd day of July, 1897, by and between Frank Billings, of the city of Cleveland, Ohio, and E. A. Shores and Emma W. Shores of the city of Ashland, witnesseth:

"That whereas said E. A. Shores holds a certain option from the Nelson Mining Company for the purchase from that company of the fee of the following described real estate, to wit: The southeast quarter of the southwest quarter (S. E. ¼ of the S. W. ¼), and the southeast quarter (S. E.¼) of section ten (10), township forty five north (45 N.) of range one east (1 E.) in the county of Iron (formerly Ashland), in the state of Wisconsin, and for the assignment of the rights of the Nelson Mining Company as assignee of Emeline Vaughn McKinnon, under a certain mining lease granted by said Emeline Vaughn McKinnon to the Shores Mining Company, dated April 15th, 1893, and recorded in the office of the register of deeds of Iron county, Wisconsin, in volume 1, at page 249 and following; and whereas said E. A. Shores has assigned said option to said Frank Billings under an arrangement and agreement by which said Billings is to cause to be paid to said Nelson Mining Company the sum of $13,000, as the consideration for the conveyance to him by the Nelson Mining Company of the fee of said property and of the assignment of said lease:

"Now, therefore, it is mutually agreed by and between the above-named Frank Billings, Emma W. Shores and E. A. Shores as follows, to wit: First. That the said Emma W. Shores and E. A. Shores are to execute and deliver to said Frank Billings a joint and several promissory note for two-thirds of said $13,000, to wit, the sum of $8,666.67, payable on or before one year after its date, with interest at the rate of six per cent., and as security for the payment of said note said Emma W. Shores and E. A. Shores are to duly execute and deliver to said Frank Billings a mortgage deed upon the present homestead property of said Emma W. Shores, known as lots one, two, three, eighteen, nineteen, and twenty (1, 2, 3, 18, 19, and 20), in block number 6, of Vaughn and Humbirds' division of the city of Ashland, Ashland county, Wisconsin. Second. That said Billings is to make a contract with the Shores Mining Company, by which he shall accord to that company a reduction in the rate of royalty to be paid by the Shores Mining Company under said existing lease for a period of three years, commencing with the year 1897, by which agreement the royalty shall be reduced from 50c to 30c per ton—the full terms of which agreement have been submitted to and are fully understood by all parties hereto. That said Billings is to retain and receive all royalties which shall hereafter be paid upon said lease, until he shall have been reimbursed in the sum of $13,000 and interest, being the full amount which is to be paid by him in the purchase of said property, and upon being reimbursed that sum, either wholly from royalties or in part from royalties and in part from payments to be made to him by said Emma W. Shores upon said note, he is to convey by quitclaim deed to said Emma W. Shores all his right, title and interest in said real estate, save and except an undivided one-third interest and share is to be reserved to him, the said Billings, and his heirs and assigns, in fee simple, and is also to assign to said Emma W. Shores all his right to the royalties which shall thereafter accrue under said lease, save and except the one-third part of said royalties, which one-third said Billings is to reserve to himself and to his heirs and assigns. Such quitclaim deed shall be free and clear of any charge or incumbrance that may be placed upon said property by said Billings or persons holding under him. Upon the receipt of said sum of $13,000 with interest, said Billings is to cancel and surrender said note and also to satisfy and surrender said mortgage. It is hereby stipulated however that the first royalties which shall be paid upon said lease shall be so credited and applied as to reimburse said Billings for the one-third part of said $13,000, other than the two-thirds part thereof represented by the note and mortgage so as aforesaid to be given by Emma W. Shores and E. A. Shores, so that if by any possibility the royalties actually paid under

said lease shall not amount to the sum of $13,000 the said Emma W. Shores and E. A. Shores shall be held liable to make good the deficiency by payment of said note. Third. It is further mutually agreed by and between the parties that when said $13,000 with interest shall have been fully paid to said Billings, that the parties hereto will execute to said Shores Mining Company a new mining lease upon said property, upon substantially the same terms as the existing lease, with the exception that in said lease it shall be stipulated that thereafter one-third part of the royalties thereafter to be paid shall be paid in severalty to said Billings and the residue thereof shall be paid in severalty to said Emma W. Shores."

Another contract was made between the appellant and Shores Mining Company, of like date, as referred to in the foregoing agreement, as follows:

"Whereas Frank Billings holds a certain option from the Nelson Mining Company for the purchase from that company of the following described real estate, to wit: The southeast quarter of the southwest quarter (S. E.¼ of the S. W. ¼), and the southeast quarter (S. E.¼) of section ten (10), township forty-five north (45 N.) of range one east (1 E.), in the county of Iron (formerly Ashland), in the state of Wisconsin; and also for the purchase of the rights of said Nelson Mining Company in and to that certain mining lease which was made by Emeline Vaughn McKinnon to M. R. Hunt and subsequently assigned by said Hunt to the Shores Mining Company, dated April 15th, 1893, and recorded in the office of the register of deeds of Iron county in volume 1, on page 249 and following, which lease was assigned by said Emeline Vaughn McKinnon by mesne assignment to said Nelson Mining Company. And whereas said Shores Mining Company desires to obtain a reduction in the rate of royalties stipulated for in said existing mining lease: Now, therefore, it is hereby mutually agreed by and between said Frank Billings as party of the first part, and said Shores Mining Company as party of the second part, that if he, the said Frank Billings, shall purchase the fee of said real estate, and procure an assignment from said Nelson Mining Company of its right under said lease, that he, the said Billings, will reduce the royalty which is to be paid by said Shores Mining Company for the ore which it shall mine from said premises under said lease for and during the year 1897, and for and during the next succeeding two years, to wit: the years 1898 and 1899, to the rate and price of 30c per ton, instead of 50c per ton as written in said lease. In consideration whereof said Shores Mining Company agrees that it will pay or cause to be paid to said Frank Billings, as rent or royalty, under said lease, for the year 1897, the sum of at least $13,000, whether the royalties computed at the rate of 30c per ton on the ore which shall be mined during the year 1897 shall amount to that sum or not; and if at the close of the year 1897 it shall be found that the amounts paid by the Shores Mining Company to said Billings on account of royalties on ore mined during the year 1897 shall not have amounted to the sum of $13,000, said Shores Mining Company agrees to pay such additional sum, that with the royalties theretofore paid by it during the year 1897 upon ores mined, shall amount to the sum of $13,000. If the amount thus paid by the Shores Mining Company as rent or royalty shall exceed the royalty at the rate of 30c per ton on the ore actually mined during the year 1897, then such excess of payment shall be treated as advance rents or royalty upon ore to be mined during any subsequent year of the term of said lease in excess of the stipulated annual quantity of 10,000 tons. Said lease shall in all respects remain in full force and unmodified, except as it is expressly modified by the terms of this paper. This agreement shall go into effect and become operative immediately upon the conveyance to said Frank Billings by the Nelson Mining Company of the fee of said real estate, and the transfer to him by said Nelson Mining Company of its rights under the original lessor of said mining lease.

"It is further agreed and stipulated that in case said Billings shall hereafter desire to transfer to any person or persons an undivided interest in said lands, then, if he shall so require, the existing lease hereinbefore referred to shall be canceled, and in lieu thereof a new lease shall be entered into between the said Billings and such person or persons to whom he shall transfer, or desire to transfer, an interest in said lands as lessors, and the Shores Mining Company as lessees, upon substantially the same terms as the exist-

ing lease, with the exception that in such new lease a fixed share or portion of said royalties shall be payable in severalty to said Billings, and a fixed share or portion of said royalties shall be payable in severalty to his trans-feree, as he, the said Billings may hereafter in writing direct."

2. The second bill (No. 1,266) rests upon the foregoing contract, conveyance thereunder to Billings, alleged repayment of the full amount provided to be paid as the share of the appellees for two-thirds, and refusal of Billings to convey as agreed. The findings of fact by the trial court which appear to be directly applicable to the equity issues are numbered 11 and 15. No. 11 reads: "On December 31, 1897, the sum of $13,000, royalty upon the ore mined and shipped in 1897, became due from the Shores Mining Company under the contracts with Tod, Stambaugh & Co., but not from Emma W. Shores, as her note for two-thirds of said sum did not fall due until July 23, 1898. But said firm, instead of charging the $13,000, in the account, charged up only $4,830.70 thereof, and by letter to the Shores Company extended the payment of the balance for an indefinite time, which was assented to by the Shores Company. On May 1, 1899, said firm charged the balance of the $13,000, being the $8,169.30 in said account, and on June 8, 1899, E. A. Shores wrote to said Billings refer-ring to the royalty matter as closed, and requesting a release of the mort-gage on the homestead and a deed to Mrs. Shores of two-thirds of the mine. On May 16, 1899, Shores again requested the discharge and deed. On May 18, 1899, Billings wrote Shores that the discharge should not pass until the stock pile was weighed out, but that he need have no fear but that the proper release would be made. After this correspondence freights on ore very much increased in amount, and thereafter it was claimed by Tod, Stambaugh & Co. that the full amount of the royalty for 1897 had not been paid. For this reason the mortgage was not released." No. 15 relates as well to payments of the Upham notes, and then, in reference to the $13,000 royalty item, states that $4,830 "was paid at the same time it was charged, December 31, 1897," by "application of payments," and that "the balance of $8,169.30," charged on the account May 1, 1899, "was fully paid, with interest, July 11, 1899, by apply-ing the payment of $13,080 made on that day."

Other facts, contracts and findings of fact bearing upon the issues are stated in the opinion.

Gerhard M. Dahl and H. H. McKeehan, for appellant.
Charles Quarles and H. B. Walmsley, for appellees.

Before GROSSCUP, BAKER and SEAMAN, Circuit Judges.

SEAMAN, Circuit Judge, after stating the facts, delivered the opin-ion of the court.

The transcript of record upon these appeals is voluminous—con-taining testimony, contracts, accounts, correspondence, and findings in reference to the transactions between Tod, Stambaugh & Co. and Shores Mining Company, commencing in 1897 and extending beyond the period involved in the present controversy. In the arguments of counsel at the bar and in the briefs like range of discussion appears concerning the facts and state of accounts in those transactions, to-gether with various contentions as to the rule of application of pay-ments and other propositions of law which are not, as we believe, in-volved in the solution of this plain issue of fact, under both bills, name-ly: Were means for payment of Mrs Shores' liability in the hands of the appellant and his firm; and was it rightly understood between the parties that such means were applicable and thus applied? The answer to that inquiry upon our view of the undisputed evidence is free from difficulty, and neither calls for examination of the numerous transactions in detail between Tod, Stambaugh & Co. and Shores Mining Company in their dealings under the contracts for mining and

selling ore, nor of the ultimate state of accounts between such principals. The conceded facts, however, of the inception, course, and character of that business, of circumstances therein having reference to the subject-matter of the present controversy, and the relations of those principals to the parties herein, enter into consideration and have important bearing.

On July 1, 1897, when the contracts in question were made, the Shores Mining Company was in possession of the mines, under a lease, with ore mined and in stock pile which subsequently netted over $33,000; but was indebted for royalties and other claims in a large amount, and without ready means to discharge the debts or carry on mining operations. Eugene A. Shores was president of this company and exclusive manager. Tod, Stambaugh & Co., through Mr. Billings, agreed to advance the money needed for these purposes, conditioned that they were to be the exclusive agency for marketing the ores. A so-called "sales-agency contract" was executed, which specifies the various payments to be met by them; provides that they are to report sales, remit balances, and keep accounts; that they are to have commissions and are to retain advances from the proceeds of sales.

Connected with and referred to in that contract, among the advances to be made, were the transactions in the present controversy. Mr. Shores held an option for conveyance to him of the fee of the mine so leased to his company upon payment of $13,000 cash, together with security for payment of $22,000 owing by the company for back royalties and labor claims. This option was deemed valuable and purchase thereunder mutually desirable; and to that end the mortgage and contract in suit were executed between Mr. and Mrs. Shores, of the one part, and Mr. Billings (who acted in truth for Tod, Stambaugh & Co.) of the other part. For the $22,000 notes were made by Shores, indorsed by W. H. Upham, and their application in conformity with the option was provided for in the "sales-agency contract" above mentioned. The contract between Mr. and Mrs. Shores and Billings provided that Billings was to pay the $13,000, take conveyance of the fee to himself, retain title to one-third, and convey two-thirds to Mrs. Shores when the amount of that share in the purchase money ($8,-666.67), secured by mortgage upon her homestead, was paid up. It further provided that Billings was to contract with the Shores Mining Company to reduce the royalties to be paid during the term of three years commencing with 1897 from 50 to 30 cents per ton; and that he was to retain and receive all royalties thereafter paid until the $13,000 and interest was paid up, such payments to apply upon the mortgage indebtedness. The mortgage and notes for $8,666.67 were executed in conformity with this arrangement.

These several contracts are of even date—July 23, 1897—and operation under the "sales-agency contract" was carried out during the shipping seasons of 1897, 1898, and 1899; and the findings state that transactions thereunder continued "until about March 12, 1900." It is further stated in the findings that the aggregate of ore sold thereunder was 43,477 tons, yielding in gross $146,845.47; also, that royalties were charged and entered into the sales-agency accounts for 1897, "but no royalty was charged therein for 1898 or 1899."

The appellee Mrs. Shores owned the mortgage premises as her separate property; and thus gave the security upon which the Billings contract for conveyance of the two-thirds interest in the mine to her was entered into. Her rights, both to satisfaction of the mortgage and conveyance of that interest, if the conditions thereof were performed on her behalf, are unquestionable. She was not a party to the sales-agency agreements, nor bound for the performance thereof, nor interested therein beyond such equities as were conferred by the arrangements, respectively, to have proceeds thereunder applied upon her liability. If such proceeds accrued and the understanding of the parties met in their application to the extent of that liability, no further questions arise under the issues; and the conclusions of the trial court are well supported. The evidence upon this inquiry, direct and inferential, is not only convincing, but substantially without dispute, and may be thus summarized:

On December 31, 1897, after the close of shipments for that season, Tod, Stambaugh & Co. charged up in their account with Shores Mining Company $4,830.70 as the share of proceeds then applicable upon the $13,000, commutation of royalty, all payable under the terms of their agreement, in 1897, "whether earned or not." This is conceded to be the identical royalty provision made applicable for payments upon Mrs. Shores' mortgage and contract liability. To the extent thus applied, pro rata extinguishment of that liability is found by the trial court and undisputed. As explained in their letter of January 27, 1898, instead of charging up the entire sum of $13,000, which was agreed upon, Tod, Stambaugh & Co. "deemed it best for the present to charge the royalty on the actual amount of ore shipped from the dock," and were of opinion that such method could not "possibly disarrange matters in any way."

Operations under the sales-agency contract continued during 1898 and 1899, with no friction or misunderstanding disclosed by the evidence, and no further account was kept of royalties; nor does it appear that the matter of closing up that account and the contingent affairs of Mrs. Shores were referred to between any of the parties until May, 1899. As stated in one of the findings (12) of the trial court, Tod, Stambaugh & Co. kept an account, throughout the operations, "in which all advances by the firm for the company, all receipts from the sale of ore, commissions, and other matters were entered, and a copy of such account was sent to the Shores Co. each month"; and periodical interest charges were made.

On May 16, 1899, Mr. Shores wrote to Mr. Billings, inclosing weekly mine reports, and stating that their last monthly report was not received; also that he hoped to receive it before going "to Canada on Saturday next," together with "a release of the mortgage on Mrs. Shores' home and deed from you for her ⅔ of the land at mine." On May 18, 1899, Mr. Billings answered:

"Monthly statement goes forward to-day. In regard to the cancellation of the mortgage, it would be impossible to have this done before you go to Canada, but undoubtedly the papers will all be completed by the time you return. I do not think, however, that the papers should pass until the stock pile is weighed out. You need have no fears, however, but what the proper release will be made all the way through."

It further appears that Mr. Billings wired later that "the mortgage would be discharged and papers sent within two or three days"; moreover, that the "stock pile" subsequently weighed out in the shipments 11,701 tons, thus overrunning the mine report (referred to in Shores' letter), which was 10,803 tons. This correspondence was followed by the monthly statement for May, wherein the entry appears as of May 1, 1899, of "balance due for royalties on Shores' ore and interest on same to May 1, 1899," total amount $13,000, with the balance stated at $9,181, after charging up interest (compounded) at $1,011.70, and deducting the amount of royalty charged up December 31, 1897, $4,830.70.

The fact alone that the total of the royalty allowance which was to apply upon the mortgage was thus charged up to the Shores Mining Company would not amount to satisfaction of the mortgage indebtedness. It might well have been so treated by way of advancement upon their contract, for a reasonable time, without operating as a discharge of Mrs. Shores' liability. On the other hand, her mortgage was not made in terms applicable as security for the account of Shores Mining Company with Tod, Stambaugh & Co. in their various transactions; and it is obvious from all the circumstances that it was not so intended, and cannot be so treated. Its payment and satisfaction was not dependent upon the final state of account between those parties; nor was the appellant entitled to withhold discharge to abide such result in subsequent transactions and accountings. The meaning and effect of this May entry, therefore, must be ascertained in the light of the correspondence referred to, together with conditions then appearing, and irrespective of subsequent and unforeseen developments.

When Mr. Billings was thus called upon to close up the side transactions of mortgage and mine ownership, the operation under the sales-agency agreement was about entering upon the third season, with satisfactory performance and results thus far, good output for the ensuing season reported in the "stock pile," and the proceeds in sight of a sale of 12,000 tons of ore to Cleveland Rolling Mill Company, on which $13,080 was paid to Tod, Stambaugh & Co. July 11th. The just inference from the correspondence and prior circumstances, followed by the entry in their accounts, is unmistakable, as we believe, that Mr. Billings and his firm were satisfied, not only that Mrs. Shores was entitled to present application of the royalty charge in payment of her liability, but that the status of their affairs with the Shores Mining Company justified such action on their part, and so made the entry referred to as their acknowledgment of payment. That this was their understanding, at least of the security of their account with the mining company at that stage, is corroborated by the terms of their letter (in evidence) of May 11, 1899, to Ashland National Bank, accepting an order drawn by the mining company upon them, for payment of a claim held by the bank out of the mining company's balance in such account. None of the testimony is in substantial conflict with the view above stated, and no other explanation appears for charging up the balance of royalty and interest computations in the May statement. .

With the evidence thus concurring to establish that there was mutual understanding of the parties in such settlement—and no different ver-

sion was set up on the part of the appellant or his firm until long after-wards, when new conditions had arisen—the rights of the appellees to the relief sought in these suits were unaffected by the subsequent trans-actions or state of accounts between Tod, Stambaugh & Co. and Shores Mining Company. So neither the items of that account nor the amount of unpaid indebtedness are within the present issues; nor is it needful to ascertain whether royalty or advances were entitled to preference under the agreements, or whether the "expenditure of a large amount of money in exploration work, from which it received no results" (vide appellant's brief), was rightfully treated as advances thereunder.

Each of the decrees appealed from conforms to the foregoing view, and each is therefore affirmed.